Exhibit [A]

## Maurice Symonette illegal Yacht seizure Timeline

### June 12, 2016

1) April 5,2016 - Date Yacht got tilted – Ropes got cut and pump got destroyed – no police report was made.
2) April 5, 2016 - Date began working on getting the boat up.
3) April 15, 2016 received first notice. Officer Blanchard told me he sent a certified letter. I never received. The Order to Comply for May 3, 2016 I also never received. I got copies of both letters from Larry Spring's Secretary.
4) May 5, 2016 Police Sea Tow and Westbrook towing showed up to remove the Yacht weekend to get the boat up. They were not able to get the boat up, it kept falling over.
5) April 5, 2016 made up 5 weeks and 2 days we had been working to get the boat up before the Police showed up again.
6) May 15,2016, Police Officer Mcnally showed up on to tell him if he gets the boat up before Wednesday we can move the boat because it is my property.
7) May 16, 2016 me and friends got the boat up that Monday Night and was prepared to move it Tuesday Morning.
8) May 17, 2016 - Westbrook and Sea Tow came in that Tuesday Morning to take the boat 1 day before the deadline.
9) May 17, 2016 - Officer Mahjir ordered me off the boat with the threat of getting arrested if I did not get off. He also forbid me from untying the boat from my house as they began to tow the boat away. They destroyed up my air conditioning, piano and Jacuzzi by having the boat still tied to the house. Officer Patricia Fischel stood guard while they towed my yacht away.
10) May 23, 2016 - email sent to Mayor and City Council with Governor Scott's letter attached. Subject line stated Thousands of Tax dollars wasted to illegally seize Yacht.
11) May 23, 2016 – I found out when I went to City Hall that my Yacht was put on the City Council meeting for May 26, 2016 at 7:00pmYacht that was sent to the City council. As a result the Yacht was put on the City Council meeting for May 26, 2016.
12) May 26, 2016 – At City Hall Meeting I gave my scenario about what happened at the meeting including mentioning the Yacht was worth 1.2million.
13) May 26,2017 Dwetta asked Council member Scott Calvin who made very wrong statements what was his definition of a derelict boat as the Yacht was in good shape and we have video t prove it and what did he mean by the boat was abandoned when I was working on the boat for and 5 weeks and 2 days. This order did come from the Magistrate to pay the250.00 a day fine per the copy of letter I got from the City manager, Larry Spring's secretary. A Magistrate order never came for the boat to be moved which one of the notices stated that the City Attorney would have to request to even move the boat. Several of the Officers said they did not have an order from the Courts to move the boat. Dwetta also asked what did he mean the boat was submerged under water as the boat was only tilted in the water. The boat was too tall to submerge in the water as the water was only about 6 ft deep.

Pg.2

14) May 26, 2016 - The Mayor, Vice Mayor and another black council member questioned the City Manager, Larry Spring and City Attorney, Jeff Czeau heavily about why did they take the Yacht rather than put a lien on the house or the boat for money owe they owed the City. They said that should have been done to recover the 75,000 dollars the City paid to move the boat and if he paid the money he should be able to get his Yacht back. They also asked if I paid the 75,000 I should be able to get my Yacht back. The City Manager even said that he paid the Tow Company 75,000 dollars and gave them the Yacht. The Council questioned him about that about how is that possible he, the City Manager paid the Tow Company 75,00 dollars and gave them the Yacht. The City Manager said at the meeting he would sit down and meet with me the next day. about where the boat was and how to pay the money to get the Yacht back.

15) May 27, 2016 - Ciity Manager Larry Spring agreed to meet with me the next day and he told me the Yacht got destroyed.

16) I checked with West brook and Sea Tow to see if they received 75,000 dollars to tow the boat they said no way. In fact early on Sea Tow quoted me 13 to 18,000 dollars to get the boat up.

17) All of the above incidents are on Video.

Exhibit "A2"

U.S. Department of
Homeland Security

United States
Coast Guard

OCommandant
United States Coast Guard

2703 Martin Luther King Jr Ave SE
Stop 7501
Washington, DC 20593-7501
Staff Symbol: CG-INV-3
Phone: (202) 372-1042
Fax: (202) 372-8354
Email: Myisha.R.King@uscg.mil

5720
FOIA 16-CGFO-02740
September 23, 2016

Ms. Dwetta Hunter
Dhn1273865@aol.com

Dear Ms. Hunter,

This is in response to your August 22, 2016 Freedom of Information Act (FOIA) requests to the U.S. Coast Guard (USCG) concerning the incident (Activity number 5848731) concerning the vessel VICTORY on April 6, 2016. This office received your request on September 21, 2016.

Per your telephone conversation on September 21, 2016 with Ms. Myisha King of my staff, it is our understanding that you do not request the following information: names of persons who are third parties or witnesses and names of Junior Coast Guard personnel. It is also our understanding that you agree to modify your request to receive the Incident Management Activity 5848731.

We are granting your request under the FOIA, Title 5 U.S.C. § 552, as amended, and DHS' implementing regulations, 6 CFR Chapter I and Part 5. After carefully reviewing the responsive documents concerning the vessel VICTORY on April 6, 2016, I determined that they are appropriate for public release

A search of concerning the vessel inspection for the vessel VICTORY on April 5, 2016 in the Marine Information Safety Law Enforcement System (MISLE) database found no records responsive to your request. The search looked for following keywords: "VICTORY", "656976", "Certificate of Inspections ", " April 3, through April 9, 1990". This record search was conducted on September 23, 2016 by Ms. Myisha King, FOIA Specialist, of Commandant (CG-INV-3). We conducted a reasonable search for records responsive to your request and conclude there are no responsive records.

This is not a denial. You may appeal the adequacy of our search. Your appeal must be made in writing and you must submit it within 90 days from the date of receipt of this letter. Your letter should indicate that you are making an appeal based on a "no records" determination of a request made under the Freedom of Information Act and the envelope should be prominently marked "FOIA Appeal." Include in your appeal the reason(s) why you believe the search was inadequate and a copy of this letter. Send your appeal to:

> Commandant (CG-611)
> U.S. Coast Guard
> Attn: FOIA/PA Officer
> 2703 Martin Luther King Jr Ave SE, Stop 7710
> Washington, DC 20593-7710

While an adequate search was conducted, if you need any further assistance or would like to discuss any aspect of your request, please contact the (Unit/Directorate) that processed your request. You may send an e-mail to efoia@uscg.mil, call 202-475-3522, or you may contact our FOIA Public Liaison in the same manner. Additionally, you have a right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974.

EXHIBIT "A2"

P
FM: SECTOR MIAMI
TO:
INFO:
BT
UNCLAS //N16130//
SUBJ: MARINE ENVIRONMENTAL PROTECTION/POLLUTION - OIL/VICTORY/VICTORY/LAT: 25°50.9 N
LONG: 080°08.3 W
PERIOD: 060000Z APR 16 - 082359Z APR 16
1.  SITUATION.
A.  CURRENT STATUS: CLOSED - AGENCY ACTION COMPLETE
B.  NOTIFICATION: 06 APR 2016 ████████████ , NRC NOTIFICATION
C.  NARRATIVE: SECTOR MIAMI RECEIVED A REPORT OF A SUNKEN VESSE IN MIAMI, FL
D.  INVOLVED SUBJECTS:
PERSON NAME: ████████████ , DOB: , ROLE: OWNER
PERSON NAME: ████████████ DOB: , ROLE: SUBJECT OF INVESTIGATION
VESSEL NAME: VICTORY, VIN: 656976, CALL SIGN: WBO4051, FLAG: UNITED STATES, GROSS TONS:
61, LENGTH: 56.1, CLASS/TYPE/SUBTYPE: RECREATIONAL/GENERAL/GENERAL, LPOC:  NPOC:
VESSEL NAME: VICTORY, VIN: 656976, CALL SIGN: WBO4051, FLAG: UNITED STATES, GROSS TONS:
61, LENGTH: 56.1, CLASS/TYPE/SUBTYPE: RECREATIONAL/GENERAL/GENERAL, LPOC:  NPOC:
WATERWAY NAME: 3320 NE 165TH ST. MIAMI, FL.  (MAULE LAKE), ROLE: LOCATION
E.  WEATHER:
NO WEATHER DATA RECORDED
7.  ACTION TAKEN:
061119Z APR16: INITIAL NOTIFICATION - NRC INCIDENT DESCRIPTION
REPORT TAKEN BY: MST2 ████
INCIDENT TYPE: VESSEL
INCIDENT CAUSE: VESSEL SINKING
AFFECTED AREA: ATLANTIC OCEAN
AFFECTED MEDIUM: WATER

061525Z APR16: REQUESTED TIME
061555Z APR16: LAUNCH TIME AND LOCATION
061604Z APR16: ON SCENE/CSP TIME AND LOCATION
061705Z APR16: DEPART TIME AND LOCATION
061829Z APR16: SORTIE END TIME AND LOCATION
081738Z APR16: PRT ARRIVED ON SCENE AND DISCOVERED THAT THE VESSEL NO LONGER CONTAINED
ANY OIL.  CASE CLOSED.
8.  PLANS AND RECOMMENDATIONS:
9.  AMPLIFYING INFO:
10.  SORTIE DATA:
B. UNIT: SECTOR MIAMI, RESOURCE ID: CHEVY MALIBU, RISK ASSESSMENT: GREEN:16, TIME ON
SORTIE: 02:34 TIME SEARCHING: 01:00
11.  MISLE CASE ID: 1019859

http://mislescprod.osc.uscg.mil/web/desktop/Uscg.Osc.Misle.Infrastructure.Shell.application?workflow=107&entityId=1019859

*Exhibit B*

# NORTH MIAMI
**FLORIDA**

776 Northeast 125th Street, P.O. Box 610850, North Miami, FL 33261-0850

## Code Enforcement Special Magistrate

Case #:    **CENUS-2016-00001**

City of North Miami
        Plaintiff,

vs.

## Order To Comply

JAMES LITTLEJOHN & ROBERT CLAR, LEROY WILLIAMS
1977 NE 119 RD
MIAMI, FL 33181-1331

        Defendant.

Having heard testimony at the Code Enforcement Special Magistrate hearing held the **04/06/2016** and based upon the evidence, the Code Enforcement Special Magistrate enters the following findings of fact, conclusions of law and orders:

JAMES LITTLEJOHN & ROBERT CLAR, LEROY WILLIAMS is (are) found guilty of violating Ordinance 12-19 City Codes, to wit:

    12-19    (NUS) NUISANCE HEALTH & SAFETY

    NO PERSON OWNING, LEASING, RENTING OR OCCUPYING LAND IN THE
    CITY SHALL PERMIT OR MAINTAIN ANY NUISANCE WHICH TENDS TO
    ANNOY THE COMMUNITY OR INJURE THE HEALTH OF THE CITIZENS.

upon the following real property: **1977 NE 119 RD**

    28 33 52 42SANS SOUCI ESTS    PB 50-86LOT 103    BLK 14LOT SIZE   75.000 X 125OR
    20516-4414 05 2002 1COC 26198-1620 11 2005 5

**It Is Therefore Ordered That** the above-described violation shall be abated by no later than 12:00 noon on

    Tuesday, May 3, 2016

**It Is Further Ordered That** the defendant(s) pay a fine up to $250.00 per day if the violation continues beyond the time and date set for complicance in this Order. The specific fine shall be set by the Code Enforcement Special Magistrate at a hearing to be set at a future date. Said defendant(s) shall be required to appear at said hearing if they desire an opportunity to be heard on the amount of said fine or the quesiton of compliance.

**It Is Further Ordered That** upon notification by the Code Enforcement Officer and upon findings by the Code Enforcement Special Magistrate that the same violation has been repeated by the same violator, the Special Magistrate may order the violator to pay a fine not to exceed $500.00 per day for each time the violation has been repeated, beginning with the date the repeat violation is found to have occurred by the Code Enforcement Officer, and a hearing shall not be necessary for issuance of the order so providing.

**It Is Further Ordered That** since the City has prevailed in prosecuting this case before the Code Enforcement Special Magistrate, the City is entitled to recover costs of prosecution due within ten (10) days of the date of this Order to comply.



····································································································

## CONDITION & VALUATION SURVEY

····································································································

FILE NO. S - 030106AAugust 1, 2011

CONDITION AND VALUATION SURVEY ALUMINUM MOTOR YACHT

"VICTORY" OFFICIAL NUMBER D- 656976 NORTH MIAMI, FLORIDA

THIS IS TO CERTIFY THAT THE UNDERNAMED MARINE SURVEYOR DID, at

the request of Mr. Maurice

Symonette, attend the aluminum motor yacht "Victory" , Official Number

656976, while vessel was moored at North Miami, FL in order to ascertain

the current condition and value of vessel.

SUMMARY OF VALUES        In the opinion of the Undersigned Marine

Surveyor and Appraiser, the aluminum motor yacht Victory is estimated to

have the following values:                    Current Market Value

$1,000,000.00          · Replacement  Value

$ 2,000,000.00    These values are considered effective as of date of this

report and are subject to conditions and assumptions set forth below.

FILE NO. S - 030106AAugust 1, 2011      VESSEL PARTICULARS

NAME:                                    M/V Victory

OWNER:    Mr. Maurice Symonette

HOME PORT:                          North Miami, FL

OFFICIAL NUMBER:                        656976

DIMENSIONS:                                Length

56.1 ft.   (LOA 74 ft)

Breadth        19.6 ft.

   Depth           8.4 ft.     TONNAGE:

   Gross           61.00

Net               49.00     BUILT:

1977/Dania, Florida

CONSTRUCTION:      Solid welded aluminum     EXTERIOR FINISH:
High gloss Imron ™ paint    PROPULSION:       Twin GM 12V71 Twin Turbo
Diesel    ENGINE HORSEPOWER:        550 HP Each     FUEL:        Diesel
FILE NO. S – 030106AAugust 1, 2011        CONSTRUCTION & GENERAL
ARRANGEMENT    Vessel found to be an all aluminum motor vessel
converted most recently from an excursion vessel to a private yacht.    The
vessel has a raked bow with sharp entry.   Large, tinted windows are
installed in all exterior bulkheads on the main deck and upper enclosed
passenger deck.   On the main weather deck level there is a small forecastle
area and longitudinal exposed walkways on each side of the superstructure.
The bow area contains a line and chain locker with a watertight bulkhead
and a watertight deck hatch.   A large aluminum
box contains two windlass systems and ground tackle including line, chain
and anchors.    The main deck is accessed from the water or ashore via
bulwark openings port and starboard along the after portions of the main
weather deck.   The main deck level includes the wheel house, galley, main
salon and enclosed after lounge.   The interior accommodations of the main
deck are generally accessed by four non watertight doors: two sliding doors
on either side of the wheelhouse and two hinged, acrylic doors at the end of
the outboard main weather deck walkway on the port and starboard sides
of the vessel.      WHEEL HOUSE       The wheel house on the main deck
includes the following equipment:    Ritchie 10" magnetic compass
EPIRB    Auto Remote Battery Charging System     Raytheon V-850 Color
Depth Sounder    Wood Freeman Model 500 Auto Pilot System w/Remote
Raytheon R-41X Radar    ICOM IC-M80 VHF Marine Radio Telephone

Two each Uniden VHF Radios    FILE NO. S - 030106AAugust 1, 2011    Jabsco ITT Rayline Electric Controlled Searchlight    SITEX T-200 Radio Direction Finder Maximum, Inc Weather Instruments: Wind, Temperature & Barometer Chelsea Tide Clock    Audiovox Satelitte Stereo System including:    House stereo, PA & Intercom System including:    Kenwood Audio/Video Surround System    Sony 5 CD  Changer    Proton Cassette Deck    Niles Audio Mixer    Shure Micro-Address & Vocal Component System    24 Speakers located throughout the vessel    Wheel    Transmission and engine throttle controls    Engineering instrumentation    Deck of the wheel house is covered in varnished parquet wood.    GALLEY    The galley is accessed via a port side longitudinal passageway connecting the wheelhouse and the main salon.  The galley contains the following equipment:    Jenn-Air Electric Downdraft Convection Oven & Grill    NSF - D13630 Burner Cooking Unit FILE NO. S -

030106AAugust 1, 2011    Stainless Steel Triple Sink    GE Spacemaker Microwave Oven    Victory Reach In Cooler, Refrigerator & Chiller    Market Forge Model #4200 & Model 1000S Commercial Grade Turbo Ovens    The deck in the galley is covered with tile.    MAIN SALON    The main salon occupies the largest portion of the main deck interior space.  It is nicely appointed with mirrors, a big screen satellite TV, piano, sofa, loveseat and other complimentary furnishings.  Lighting is provided by a chandelier and lamps.  The deck is covered with carpeting.  A large, multi-colored, etched, art-glass divider depicting an underwater scene separates the main salon and the after lounge.    The after portion of the main deck interior space has been configured as a lounge.  The lounge is outfitted with a portable hot tub, table with four chairs and a TV/VCR combination unit.  Lighting is provided by overhead recessed fixtures.  The deck is covered with exterior wood arranged in a parquet pattern.  The upper lounge and swim platform are accessed from this space.  The upper lounge access is via an inclined ladder and the swim platform can be reached by opening a

two part, combination "Dutch type" door.    An aluminum ladder and hand rail installed on the transom provides the route from the main deck to the swim platform.      The swim platform spans the width of the vessel, is welded aluminum and integrated to the hull.      UPPER HELM STATION The Upper Helm Station has a single entry point via a vertical ladder through a water tight hatch on the port side of the station.    It has a large, opening window on the centerline of the vessel.    Visibility from this station is good.      The following equipment is installed in the Upper Helm Station: Wheel    Transmission and engine throttle controls FILE NO. S - 030106A August 1, 2011    Engineering systems instrumentation    Magellan GPS    Standard Horizon Eclipse VHF Radio    Spotlight Control Datamarine LX 300 Depth Sounder    Standard Horizon VHF Radio    SRD LABS LORAN    Ritchie 10" Compass    Barometer, Time, Tide, Wind & Temp Instruments    Just aft of the Upper Helm Station is a full beverage bar, refrigerators, sink and soft drink dispenser system arranged to provide service to the Upper Lounge.    China, stemware and flatware settings are stowed for 130 guests.      UPPER LOUNGE    The Upper Lounge is accessed by passengers via an inclined ladder from the after portion of the main deck.    It has built in, cushioned and upholstered seating installed on the entire perimeter of the space.    Additional seating is provided by high backed stools at the bar and a large sofa.    The deck is covered with carpeting.    Bulkheads and overhead are painted and nicely trimmed with contrasting stained wood and designer upholstery fabric.    Bar lighting is recessed and lounge lighting

is achieved by "sconce" type fixtures mounted on the upright outboard window frames along each side of the lounge.    A number of TV monitors and speaker systems are installed as part of the vessel-wide entertainment system.    UPPER WEATHER DECK    The upper weather deck spans the entire length of the superstructure.    Installed forward are all masts and antennas, including the satellite TV system antenna.    The vessels heating & air conditioning equipment is also installed on the upper weather deck.

Upright stanchions and nylon line form the lifeline system for the FILE NO. S - 030106AJuly 3, 2008   upper weather deck.   Night lighting is provided by solar powered lights mounted atop perimeter stanchions.   The upper weather deck is accessed by a single inclined ladder via a large opening hatch on the starboard side, aft on the upper lounge deck.   MASTER STATEROOM   The master stateroom is one level below the main deck and is

accessed via a ladder from the port side of the main salon.   It contains three opening ports and one built in closet.   It is lighted with track lighting and free standing lamps.   Furnishings include a queen bed, night stands, bureau, roll top desk, satellite television and receiver.   Overhead is painted and bulkheads are covered with wood paneling.   Floor covering is carpeting and ceramic tile.   The vessel's mechanical fuel gauges are also mounted in the deck of this space.   MASTER STATEROOM HEAD Connected by a door to the master stateroom, this head is outfitted with a single sink vanity, full tub and shower with enclosure, mirror, Lectra-san marine toilet and an opening port.   The deck is covered with vinyl and tile. GUEST HEAD   Accessed via a passageway forward of the master stateroom, this head is outfitted with a single sink vanity, shower with enclosure, mirror, Lectra-san marine toilet and an opening port.   Deck is covered

with ceramic tile.   GUEST STATEROOMS   Port and starboard guest staterooms are accessed via passageway and quick acting watertight door forward of the master stateroom and guest head.   Each guest stateroom includes two opening ports, a closet, a bunk, a desk, bulkhead mounted lights, carpeted decks, paneled bulkheads and individual heating and air conditioning controls.   CAPTAIN & CREW QUARTERS   Accessed via an inclined ladder from the port side of the main deck inside the wheelhouse. This space has a washer dryer combination unit, two bunks, a closet, built in drawers and individual heating and air conditioning controls.   A small head with sink, porti potti and a handheld shower is also in this space.   FILE NO.

S - 030106AAugust 1, 2011    ENGINEERING SPACE & EQUIPMENT
Engine room access is gained via a ladder through a water tight hatch from the main deck level aft.   Deck in engine room is aluminum grating. Engines are very accessible from all sides.   Emergency engine shutdowns and emergency fuel shutdowns are located next to the entrance hatch on the main deck. All are clearly marked.   Auto/manual bilge pump switches are located in the panel on the forward bulkhead and are clearly marked.   Onan generator set is wrapped in a sound shield.   Westerbeke genset is not sound insulated.   Main engine exhaust lagging is in good condition and includes stainless fittings and flex piping to fiberglass mufflers.   Manual gauges are mounted inboard above engines.      Propulsion:   Twin GM 12V71 Diesels with Twin Disc MG514 Gears   Vessel controls: Hynautic steering & Hynautic engine controls   Electrical service:   12, 24, 32,110 and 220 volt service through three 25KVA transformers located in the engine room.      Shore power:   3, 50 amp, 220 volt shore connectors to transformers   Circuit protection:   Trip type circuit breakers and fuses. Batteries:   Four 8D batteries in boxes.   Separate batteries for generators.    Bilge pumps: Bilge pumps installed under crew quarters and in engine room.       Air conditioning:   Chiller type unit with air handlers throughout vessel. Potable water system:   Pressure system with 20 gallon hot water heater. 650 gallon tank forward with sight gauge in bilge forward compartment. Generator:   Onan 32KW   Generator:   Westerbeke   Fuel system:   2,100 gallon capacity in four aluminum tanks located amidships under master stateroom area.   Additional equipment:   Campbell Hausfield compressor. FILE NO. S - 030106AAugust 1, 2011   LIFESAVING AND FIRE FIGHTING EQUIPMENT    Portable fire extinguishers mounted throughout vessel First Aid Kit    USCG approved life vests    One fire fighting hose w/nozzle at engine room hatch    Flare Kit      PHYSICAL CONDITION    1.   Vessel surveyed while moored without removal of sheathing, ceilings, or bolted

today's market.    Remaining economic life is defined as the amount of time (in years) that a vessel can be expected to remain fit for its intended service assuming the continuance of proper maintenance programs and adherence to recommendations set forth in survey report.   METHODOLOGY    The

enclosures to expose parts ordinarily concealed, or testing for tightness, or operating any equipment. No determination of stability characteristics or inherent structural integrity has been made and no opinion is expressed thereto. 2. Vessel housekeeping considered very good and above average. 3. Interior of vessel painted and fitted with wood trim and cabinetry, wood/plastic overheads with flooring as noted. Interior in very good condition. 4. External superstructure coating in good condition. 5. Visible areas of external hull overall in good condition. 6. Engine room bilges without excessive oil and water. 7. Engine room coatings in good condition; housekeeping good. DEFINITION OF VALUES Current market value is defined as a sum of money that a vessel should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller both acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale whereby title is passed from seller to buyer under conditions whereby: FILE NO. S - 030106AAugust 1, 2011 a. Buyer and seller are typically motivated; b. Both parties are well informed and acting in what they consider their own best interests; c. A reasonable time is allowed for exposure on the open market. Replacement cost (new) is based on the cost of construction of a vessel of similar size and capacity in today's market. Remaining economic life is defined as the amount of time (in years) that a vessel can be expected to remain fit for its intended service assuming the continuance of proper maintenance programs and adherence to recommendations set forth in survey report. METHODOLOGY The above noted market value was arrived at after determining the estimated reproduction cost of the vessel, depreciated for age, considering the anticipated remaining useful life, and adjusted for condition of the vessel, current market conditions and comparable sales. Replacement cost was arrived at by obtaining area standard quotes for new construction of similar sized vessels. Copies of market search data are

attached.    CERTIFICATION    1.    The statements and opinions expressed in this report are correct to the best of my knowledge and belief.

2.    The report analysis, opinions, and conclusions are my personal, unbiased professional analysis, opinions and conclusions.    3.    My compensation is not contingent on an action or event resulting from the analysis, opinions or conclusions in, or the use of this report.    4. My analysis, opinions and conclusions were developed, and this report has been prepared using the general guidelines set forth in the Uniform Standards of Professional Appraisal Practice.    5.    An inspection of the vessel,

which is the subject of this report, has been made by staff surveyor, Captain Jess Cooley.        FILE NO. S - 030106AAugust 1, 2011    6. This survey was undertaken and the survey report is submitted without prejudice and for the benefit of whom it may concern.    It is based on the observations and discussions of the undersigned at the time of the survey.    In this report, no reference should be construed to indicate any of the following: evaluation of the internal condition of any onboard equipment or systems and the propulsion systems operating capacity.    This vessel was surveyed without the removal of any parts, fittings, carpet, decking, sheathing, wires, plumbing, joiner work, etc ···    Additionally, no haul out or sea trials were conducted during this inspection.    7.    This report is issued subject to the condition that neither the surveyor, nor his employing firm, are to be held liable for errors of any kind.    This includes any

omission, negligence, inaccuracy, misrepresentation or misstatement in this report, or the performance of the marine surveyor.    This report represents only a statement of general observed conditions and is neither a guarantee nor a warranty of the condition of the vessel, its hull, machinery, unforeseen or undetected damages, or other conditions that may exist.    By signing below, the individual employing the services of the surveyor accepts the terms of performance, limitations and exclusions noted above.

Offered:    _Jess H Cooley_ _Jess H Cooley LCDR, USN (Ret)_

Accepted: _Maurice B_      **Owner**     Date: 04/23/13

_Maurice Symonette_

*Exb. "D"*

# NORTH MIAMI
F  L  O  R  I  D  A

776 Northeast 125th Street, North Miami, FL  33161-5654

## NOTICE OF VIOLATION

April 15, 2016

Number: **CEJNK-2016-00090**

JAMES LITTLEJOHN & ROBERT CLAR,  LEROY WILLIAMS
1977 NE  119 RD
MIAMI, FL  33181-1331

Dear Property Owner and / or Occupant:

On    4/15/2016      I made an inspection at 1977 NE  119 RD

violation of the North Miami Code of  Ordinances was observed :

**Violation of Section:   10-19**
                               **(JNK) JUNK ON PROPERTY**
NO PERSON SHALL KEEP, STORE, OR ALLOW TO REMAIN ON ANY PROPERTY WITHIN THE CITY ANY
DERELICT OR JUNK PROPERTY.

Accordingly, the following corrective measures must be taken:

> JUNK ON PROPERTY/ PER ARTICLE1. SEC 10./ BOAT IN CANAL (VICTORY). ANY
> VEHICLE/BOAT WITHOUT  REGISTRATION/DECAL. OR INOPERABLE. P

You are notified the condition(s) mentioned above must be abated by the next re-inspection date listed below. Failure
to comply will result in the issuance of a civil violation ticket or a summons to appear before the City of North
Miami Code Enforcement Special Magistrate. By State Law, this Special Magistrate has the power to levy fines for
all unabated code violations.

Additionally, you are advised that if the violation is not corrected by the time specified for correction by the code
compliance officer, the case may be presented to the Code Enforcement Special Magistrate even if the violation has
been corrected prior to the hearing.

EDMUND FITZELL
CODE COMPLIANCE OFFICER - (305) 895-9832
Code Compliance Unit

Re-Inspection scheduled for:
April 24, 2016

*Exibit D3*

No. 11-626

## FANE LOZMAN, PETITIONER *v.* THE CITY OF RIVIERA BEACH, FLORIDA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[January 15, 2013]

JUSTICE BREYER delivered the opinion of the Court.

The Rules of Construction Act defines a "vessel" as including "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U. S. C. §3. The question before us is whether petitioner's floating home (which is not self-propelled) falls within the terms of that definition.

In answering that question we focus primarily upon the phrase "capable of being used." This term encompasses "practical" possibilities, not "merely . . . theoretical" ones. *Stewart* v. *Dutra Constr. Co.*, 543 U. S. 481, 496 (2005). We believe that a reasonable observer, looking to the home's physical characteristics and activities, would not consider it to be designed to any practical degree for carrying people or things on water. And we consequently conclude that the floating home is not a "vessel."

## I

In 2002 Fane Lozman, petitioner, bought a 60-foot by 12-foot floating home. App. 37, 71. The home consisted of a house-like plywood structure with French doors on three sides. *Id.*, at 38, 44. It contained a sitting room, bedroom, closet, bathroom, and kitchen, along with a stairway leading to a second level with office space. *Id.*, at 45–66. An empty bilge space underneath the main floor kept it afloat. *Id.*, at 38. (See Appendix, *infra*, for a photograph.) After buying the floating home, Lozman had it towed about 200 miles to North Bay Village, Florida, where he moored it and then twice more had it towed between nearby marinas. In 2006 Lozman had the home towed a further 70 miles to a marina owned by the city of Riviera Beach (City), respondent, where he kept it docked. Brief for Respondent 5.

After various disputes with Lozman and unsuccessful efforts to evict him from the marina, the City brought this federal admiralty lawsuit *in rem* against the floating home. It sought a maritime lien for dockage fees and damages for trespass. See Federal Maritime Lien Act, 46 U. S. C. §31342 (authorizing federal maritime lien against vessel to collect debts owed for the provision of "necessaries to a vessel"); 28 U. S. C. §1333(1) (civil admiralty jurisdiction). See also *Leon* v. *Galceran*, 11 Wall. 185 (1871); *The Rock Island Bridge*, 6 Wall. 213, 215 (1867).

Lozman, acting *pro se,* asked the District Court to dismiss the suit on the ground that the court lacked admiralty jurisdiction. See 2 Record, Doc. 64. After summary judgment proceedings, the court found that the floating home was a "vessel" and concluded that admiralty jurisdiction was consequently proper. Pet. for Cert. 42a. The judge then conducted a bench trial on the merits and awarded the City $3,039.88 for dockage along with $1 in nominal damages for trespass. *Id.*, at 49a.

On appeal the Eleventh Circuit affirmed. *Riviera Beach* v. *That Certain Unnamed Gray, Two-Story Vessel Approximately Fifty-Seven Feet in Length*, 649 F. 3d 1259 (2011). It agreed with the District Court that the home was a "vessel." In its view, the home was "capable" of movement over water and the owner's subjective intent to remain moored "indefinitely" at a dock could not show the contrary. *Id.*, at 1267–1269.

Lozman sought certiorari. In light of uncertainty among the Circuits about application of the term "capable" we granted his petition. Compare *De La Rosa* v. *St. Charles Gaming Co.*, 474 F. 3d 185, 187 (CA5 2006) (structure is not a "vessel" where "physically," but only "theoretical[ly]," "capable of

2

sailing," and owner intends to moor it indefinitely as floating casino), with *Board of Comm'rs of Or- leans Levee Dist.* v. *M/V Belle of Orleans*, 535 F. 3d 1299, 1311-1312 (CA11 2008) (structure is a "vessel" where capable of moving over water under tow, "albeit to her detriment," despite intent to moor indefinitely). See also 649 F. 3d, at 1267 (rejecting views of Circuits that " 'focus on the intent of the shipowner' ").

## II

At the outset we consider one threshold matter. The District Court ordered the floating home sold to satisfy the City's judgment. The City bought the home at public auction and subsequently had it destroyed. And, after the parties filed their merits briefs, we ordered further briefing on the question of mootness in light of the home's destruction. 567 U. S. ____ (2012). The parties now have pointed out that, prior to the home's sale, the District Court ordered the City to post a $25,000 bond "to secure Mr. Lozman's value in the vessel." 1 Record, Doc. 20, p. 2. The bond ensures that Lozman can obtain monetary relief if he ultimately prevails. We consequently agree with the parties that the case is not moot.

## III

### A

We focus primarily upon the statutory phrase "capable of being used . . . as a means of transportation on water." 1 U. S. C. §3. The Court of Appeals found that the home was "capable" of transportation because it could float, it could proceed under tow, and its shore connections (power cable, water hose, rope lines) did not " 'rende[r]' " it " 'practically incapable of transportation or movement.' " 649 F. 3d, at 1266 (quoting *Belle of Orleans, supra,* at 1312, in turn quoting *Stewart,* 543 U. S., at 494). At least for argument's sake we agree with the Court of Appeals about the last-mentioned point, namely that Lozman's shore connections did not " 'render' " the home " 'practically incapable of transportation.' " But unlike the Eleventh Circuit, we do not find these considerations (even when combined with the home's other characteristics) sufficient to show that Lozman's home was a "vessel."

The Court of Appeals recognized that it had applied the term "capable" broadly. 649 F. 3d, at 1266. Indeed, it pointed with approval to language in an earlier case, *Burks* v. *American River Transp. Co.*, 679 F. 2d 69 (1982), in which the Fifth Circuit said:

" 'No doubt the three men in a tub would also fit within our definition, and one probably could make a convincing case for Jonah inside the whale.' " 649 F. 3d, at 1269 (brackets omitted) (quoting *Burks, supra,* at 75).

But the Eleventh Circuit's interpretation is too broad. Not *every* floating structure is a "vessel." To state the obvious, a wooden washtub, a plastic dishpan, a swimming platform on pontoons, a large fishing net, a door taken off its hinges, or Pinocchio (when inside the whale) are not "vessels," even if they are "artificial contrivance[s]" capable of floating, moving under tow, and incidentally carrying even a fair-sized item or two when they do so. Rather, the statute applies to an "artificial contrivance . . . capable of being used . . . *as a means of transportation on water.*" 1 U. S. C. §3 (emphasis added). "[T]ransportation" involves the "conveyance (of things or persons) from one place to another." 18 Oxford English Dictionary 424 (2d ed. 1989) (OED). Accord, N. Webster, An American Dictionary of the English Language 1406 (C. Goodrich & N. Porter eds. 1873) ("[t]he act of transporting, carrying, or conveying from one place to another"). And we must apply this definition in a "practical," not a "theoretical," way. *Stewart, supra,* at 496. Consequently, in our view a structure does not fall within the scope of this statutory phrase unless a reasonable observer, looking to the home's physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water.

3

## B

Though our criterion is general, the facts of this case illustrate more specifically what we have in mind. But for the fact that it floats, nothing about Lozman's home suggests that it was designed to any practical degree to transport persons or things over water. It had no rudder or other steering mechanism. 649 F. 3d, at 1269. Its hull was unraked, *ibid.*, and it had a rectangular bottom 10 inches below the water. Brief for Petitioner 27; App. 37. It had no special capacity to generate or store electricity but could obtain that utility only through ongoing connections with the land. *Id.*, at 40. Its small rooms looked like ordinary nonmaritime living quarters. And those inside those rooms looked out upon the world, not through watertight portholes, but through French doors or ordinary windows. *Id.*, at 44-66.

Although lack of self-propulsion is not dispositive, *e.g., The Robert W. Parsons*, 191 U. S. 17, 31 (1903), it may be a relevant physical characteristic. And Lozman's home differs significantly from an ordinary houseboat in that it has no ability to propel itself. Cf. 33 CFR §173.3 (2012) ("Houseboat means a *motorized* vessel . . . designed primarily for multi-purpose accommodation spaces with low freeboard and little or no foredeck or cockpit" (emphasis added)). Lozman's home was able to travel over water only by being towed. Prior to its arrest, that home's travel by tow over water took place on only four occasions over a period of seven years.*Supra*, at 2. And when the home was towed a significant distance in 2006, the towing company had a second boat follow behind to prevent the home from swinging dangerously from side to side. App. 104.

The home has no other feature that might suggest a design to transport over water anything other than its own furnishings and related personal effects. In a word, we can find nothing about the home that could lead a reasonable observer to consider it designed to a practical degree for "transportation on water."

## C

Our view of the statute is consistent with its text, precedent, and relevant purposes. For one thing, the statute's language, read naturally, lends itself to that interpretation. We concede that the statute uses the word "every," referring to "*every* description of watercraft or other artificial contrivance." 1 U. S. C. §3 (emphasis added). But the term "contrivance" refers to "something contrived for, or employed in contriving to effect a purpose." 3 OED 850 (def. 7). The term "craft" explains that purpose as "water carriage and transport." *Id.*, at 1104 (def. V(9)(b)) (defining "craft" as a "vesse[l] . . . for" that purpose). The ad-dition of the word "water" to "craft," yielding the term "watercraft," emphasizes the point. And the next few words, "used, or capable of being used, as a means of transportation on water," drive the point home.

For another thing, the bulk of precedent supports our conclusion. In *Evansville & Bowling Green Packet Co.v. Chero Cola Bottling Co.*, 271 U. S. 19 (1926), the Court held that a wharfboat was *not* a "vessel." The wharfboat floated next to a dock; it was used to transfer cargo from ship to dock and ship to ship; and it was connected to the dock with cables, utility lines, and a ramp. *Id.*, at 21. At the same time, it was capable of being towed. And it was towed each winter to a harbor to avoid river ice. *Id.*, at 20-21. The Court reasoned that, despite the annual movement under tow, the wharfboat "was not used to carry freight from one place to another," nor did it "encounter perils of navigation to which craft used for transportation are exposed." *Id.*, at 22. (See Appendix, *infra*, for photograph of a period wharfboat).

The Court's reasoning in *Stewart* also supports our conclusion. We there considered the application of the statutory definition to a dredge. 543 U. S., at 494. The dredge was "a massive floating platform" from which a suspended clamshell bucket would "remov[e] silt from the ocean floor," depositing it "onto one of two scows" floating alongside the dredge. *Id.*, at 484. Like more traditional "seagoing vessels," the dredge had, *e.g.*, "a captain and crew, navigational lights, ballast tanks, and a crew dining area." *Ibid.* Unlike more ordinary vessels, it could navigate only by "manipulating its anchors and

4

cables" or by being towed. *Ibid.* Nonetheless it did move. In fact it moved over water "every couple of hours." *Id.,* at 485.

We held that the dredge was a "vessel." We wrote that §3's definition "merely codified the meaning that the term 'vessel' had acquired in general maritime law." *Id.,* at 490. We added that the question of the "watercraft's use 'as a means of transportation on water' is . . . practical," and not "merely . . . theoretical." *Id.,* at 496. And we pointed to cases holding that dredges ordinarily "served a waterborne transportation function," namely that "in performing their work they carried machinery, equipment, and crew over water." *Id.,* at 491-492 (citing, *e.g., Butler* v. *Ellis,* 45 F. 2d 951, 955 (CA4 1930)).

As the Court of Appeals pointed out, in *Stewart* we also wrote that §3 "does not require that a watercraft be used *primarily* for that [transportation] purpose," 543 U. S., at 495; that a "watercraft need not be in motion to qualify as a vessel," *ibid.*; and that a structure may qualify as a vessel even if attached--but not "permanently" attached--to the land or ocean floor. *Id.,* at 493-494. We did not take these statements, however, as implying a universal set of sufficient conditions for application of the definition. Rather, they say, and they mean, that the statutory definition *may* (or may not) apply--not that it *automatically must* apply--where a structure has some other *primary* purpose, where it is stationary at relevant times, and where it is attached--but not permanently attached--to land.

After all, a washtub is normally not a "vessel" though it does not have water transportation as its primary purpose, it may be stationary much of the time, and it might be attached--but not permanently attached--to land. More to the point, water transportation was not the *primary purpose* of either *Stewart*'s dredge or *Evansville*'s wharfboat; neither structure was "in motion" at relevant times; and both were sometimes attached (though not permanently attached) to the ocean bottom or to land. Nonetheless *Stewart*'s dredge fell within the statute's definition while *Evansville*'s wharfboat did not.

The basic difference, we believe, is that the dredge was regularly, but not primarily, used (and designed in part to be used) to transport workers and equipment over water while the wharfboat was not designed (to any practical degree) to serve a transportation function and did not do so. Compare *Cope* v. *Vallette Dry Dock Co.,* 119 U. S. 625 (1887) (floating drydock not a "vessel" because permanently fixed to wharf), with *Jerome B. Grubart, Inc.* v. *Great Lakes Dredge & Dock Co.,* 513 U. S. 527, 535 (1995) (barge sometimes attached to river bottom to use as a work platform remains a "vessel" when "at other times it was used for transportation"). Seealso *ibid.* (citing *Great Lakes Dredge & Dock Co.* v. *Chicago,* 3 F. 3d 225, 229 (CA7 1993) ("[A] craft is a 'vessel' if its purpose is to some reasonable degree 'the transportation of passengers, cargo, or equipment from place to place across navigable waters' ")); *Cope, supra,* at 630 (describing "hopper-barge," as potentially a "vessel" because it is a "navigable structure[,] used for the purpose of transportation"); cf. 1 Benedict on Admiralty §164, p. 10-6 (7th rev. ed. 2012) (maritime jurisdiction proper if "the craft is a navigable structure intended for maritime transportation").

Lower court cases also tend, on balance, to support our conclusion. See, *e.g., Bernard* v. *Binnings Constr. Co.,* 741 F. 2d 824, 828, n. 13, 832, n. 25 (CA5 1984) (work punt lacking features objectively indicating a transportation function not a "vessel," for "our decisions make clear that the mere capacity to float or move across navigable waters does not necessarily make a structure a vessel"); *Ruddiman* v. *A Scow Platform,* 38 F. 158 (SDNY 1889) (scow, though "capable of being towed . . . though not without some difficulty, from its clumsy structure" just a floating box, not a "vessel," because "it was not designed or used for the purpose of navigation," not engaged "in the transportation of persons or cargo," and had "no motive power, no rudder, no sails"). See also 1 T. Schoenbaum, Admiralty and Maritime Law §3-6, p. 155 (5th ed. 2011) (courts have found that "floating dry-dock[s]," "floating platforms, barges, or rafts used for construction or repair of piers, docks, bridges, pipelines and other" similar facilities are not "vessels"); E. Benedict, American Admiralty §215, p. 116 (3d rev. ed. 1898) (defining "vessel" as a " 'machine adapted to transportation over rivers, seas, and oceans' ").

We recognize that some lower court opinions can be read as endorsing the "anything that floats" approach. See *Miami River Boat Yard, Inc.* v. *60' Houseboat,* 390 F. 2d 596, 597 (CA5 1968) (so-called "houseboat" lacking self-propulsion); *Sea Village Marina, LLC* v. *A 1980 Carlcraft Houseboat,*

5

No. 09-3292, 2009 WL 3379923, \*5-\*6 (D NJ, Oct. 19, 2009) (following *Miami River Boat Yard*); *Hudson Harbor 79th Street Boat Basin, Inc.* v. *Sea Casa*, 469 F. Supp. 987, 989 (SDNY 1979) (same). Cf. *Holmes* v. *Atlantic Sounding Co.*, 437 F. 3d 441 (CA5 2006) (floating dormitory); *Summerlin* v. *Massman Constr. Co.*, 199 F. 2d 715 (CA4 1952) (derrick anchored in the river engaged in building a bridge is a vessel). For the reasons we have stated, we find such an approach inappropriate and inconsistent with our precedents.

Further, our examination of the purposes of major federal maritime statutes reveals little reason to classify floating homes as "vessels." Admiralty law, for example, provides special attachment procedures lest a vessel avoid liability by sailing away. 46 U. S. C. §§31341-31343 (2006 ed. and Supp. IV). Liability statutes such as the Jones Act recognize that sailors face the special " 'perils of the sea.' " *Chandris, Inc.* v. *Latsis*, 515 U. S. 347, 354, 373 (1995) (referring to " 'vessel[s] in navigation' "). Certain admiralty tort doctrines can encourage shipowners to engage in port-related commerce. *E.g.*, 46 U. S. C. §30505; *Executive Jet Aviation, Inc.* v. *Cleveland*, 409 U. S. 249, 269-270 (1972). And maritime safety statutes subject vessels to U. S. Coast Guard inspections. *E.g.*, 46 U. S. C. §3301.

Lozman, however, cannot easily escape liability by sailing away in his home. He faces no special sea dangers. He does not significantly engage in port-related commerce. And the Solicitor General tells us that to adopt a version of the "anything that floats" test would place unnecessary and undesirable inspection burdens upon the Coast Guard. Brief for United States as *Amicus Curiae* 29, n. 11.

Finally, our conclusion is consistent with state laws in States where floating home owners have congregated in communities. See Brief for Seattle Floating Homes Association et al. as *Amici Curiae* 1. A Washington State environmental statute, for example, defines a floating home (for regulatory purposes) as "a single-family dwelling unit constructed on a float, that is moored, anchored, or otherwise secured in waters, and is not a vessel, even though it may be capable of being towed." Wash. Rev. Code Ann. §90.58.270(5)(b)(ii) (Supp. 2012). A California statute defines a floating home (for tax purposes) as "a floating structure" that is "designed and built to be used, or is modified to be used, as a stationary waterborne residential dwelling," and which (unlike a typical houseboat), has no independent power generation, and is dependent on shore utilities. Cal. Health & Safety Code Ann. §18075.55(d) (West 2006). These States, we are told, treat structures that meet their "floating home" definitions like ordinary land-based homes rather than like vessels. Brief for Seattle Floating Homes Association 2. Consistency of interpretation of related state and federal laws is a virtue in that it helps to create simplicity making the law easier to understand and to follow for lawyers and for nonlawyers alike. And that consideration here supports our conclusion.

## D

The City and supporting *amici* make several important arguments that warrant our response. First, they argue against use of any purpose-based test lest we introduce into "vessel" determinations a subjective element--namely, the owner's intent. That element, they say, is often "unverifiable" and too easily manipulated. Its introduction would "foment unpredictability and invite gamesmanship." Brief for Respondent 33.

We agree with the City about the need to eliminate the consideration of evidence of subjective intent. But we cannot agree that the need requires abandonment of all criteria based on "purpose." Cf. *Stewart*, 543 U. S., at 495 (discussing transportation purpose). Indeed, it is difficult, if not impossible, to determine the use of a human "contrivance" without some consideration of human purposes. At the same time, we have sought to avoid subjective elements, such as owner's intent, by permitting consideration only of objective evidence of a waterborne transportation purpose. That is why we have referred to the views of a reasonable observer. *Supra,* at 1. And it is why we have looked to the physical attributes and behavior of the structure, as objective manifestations of any relevant purpose, and not to the subjective intent of the owner. *Supra,* at 5-6. We note that various admiralty treatises refer to the use of purpose-based tests without any suggestion that administration of those

6

tests has introduced too much subjectivity into the vessel-determination process. 1 Benedict on Admiralty §164; 1 Admiralty and Maritime Law §3-6.

Second, the City, with support of *amici*, argues against the use of criteria that are too abstract, complex, or open-ended. Brief for Respondent 28-29. A court's jurisdiction, *e.g.*, admiralty jurisdiction, may turn on application of the term "vessel." And jurisdictional tests, often applied at the outset of a case, should be "as simple as possible." *Hertz Corp.* v. *Friend*, 559 U. S. ___, ___ (2010) (slip op., at 1).

We agree with the last-mentioned sentiment. And we also understand that our approach is neither perfectly pre-cise nor always determinative. Satisfaction of a design-based or purpose-related criterion, for example, is not always sufficient for application of the statutory word "vessel." A craft whose physical characteristics and activities objectively evidence a waterborne transportation purpose or function may still be rendered a nonvessel by later physical alterations. For example, an owner might take a structure that is otherwise a vessel (even the *Queen Mary*) and connect it permanently to the land for use, say, as a hotel. See *Stewart, supra,* at 493-494. Further, changes over time may produce a new form, *i.e.*, a newly designed structure--in which case it may be the new de-sign that is relevant. See *Kathriner* v. *Unisea, Inc.*, 975 F. 2d 657, 660 (CA9 1992) (floating processing plant was no longer a vessel where a "large opening [had been] cut into her hull").

Nor is satisfaction of the criterion always a necessary condition, see Part IV, *infra.* It is conceivable that an owner might *actually use* a floating structure not designed to any practical degree for transportation as, say, a ferry boat, regularly transporting goods and persons over water.

Nonetheless, we believe the criterion we have used, taken together with our example of its application here, should offer guidance in a significant number of borderline cases where "capacity" to transport over water is in doubt. Moreover, borderline cases will always exist; they require a method for resolution; we believe the method we have used is workable; and, unlike, say, an "anything that floats" test, it is consistent with statutory text, purpose, and precedent. Nor do we believe that the dissent's approach would prove any more workable. For example, the dissent suggests a relevant distinction between an owner's "clothes and personal effects" and "large appliances (like an oven or a refrigerator)." *Post,* at 8 (opinion of SOTOMAYOR, J.). But a transportation function need not turn on the size of the items in question, and we believe the line between items being transported from place to place (*e.g.*, cargo) and items that are mere appurtenances is the one more likely to be relevant. Cf. Benedict, American Admiralty §222, at 121 ("A ship is usually described as consisting of the ship, her tackle, apparel, and furniture . . .").

Finally, the dissent and the Solicitor General (as *amicus* for Lozman) argue that a remand is warranted for further factfinding. See *post,* at 10-12; Brief for United States as *Amicus Curiae* 29-31. But neither the City nor Lozman makes such a request. Brief for Respondent 18, 49, 52. And the only potentially relevant factual dispute the dissent points to is that the home suffered serious damage during a tow. *Post,* at 10-11. But this would add support to our ultimate conclusion that this floating home was not a vessel. We consequently see nothing to be gained by a remand.

## IV

Although we have focused on the phrase "*capable* of being used" for transportation over water, the statute also includes as a "vessel" a structure that is *actually* "used" for that transportation. 1 U. S. C. §3 (emphasis added). And the City argues that, irrespective of its design, Lozman's floating home was *actually* so used. Brief for Respondent 32. We are not persuaded by its argument.

We are willing to assume for argument's sake that sometimes it is possible actually to use for water transportation a structure that is in no practical way designed for that purpose. See *supra,* at 12-13. But even so, the City cannot show the actual use for which it argues. Lozman's floating home moved only under tow. Before its arrest, it moved significant distances only twice in seven years. And when it moved, it carried, not passengers or cargo, but at the very most (giving the benefit of any factual

7

ambiguity to the City) only its own furnishings, its owner's personal effects, and personnel present to assure the home's safety. 649 F. 3d, at 1268; Brief for Respondent 32; Tr. of Oral Arg. 37-38. This is far too little *actual* "use" to bring the floating home within the terms of the statute. See *Evansville*, 271 U. S., at 20-21 (wharfboat not a "vessel" even though "[e]ach winter" it "was towed to [a] harbor to protect it from ice"); see also *Roper* v. *United States*, 368 U. S. 20, 23(1961) ("Unlike a barge, the S. S. *Harry Lane* was not moved in order to transport commodities from one location to another"). See also *supra*, at 6-11.

## V

For these reasons, the judgment of the Court of Appeals is reversed.

*Exb. E*

# NORTH MIAMI
F L O R I D A

776 Northeast 125th Street, P.O. Box 610850, North Miami, FL 33261-0850

## Code Enforcement Special Magistrate

Case #:   **CENUS-2016-00001**

City of North Miami
     Plaintiff,

vs.

## Order To Comply

JAMES LITTLEJOHN & ROBERT CLAR, LEROY WILLIAMS
1977 NE 119 RD
MIAMI, FL 33181-1331

     Defendant.

Having heard testimony at the Code Enforcement Special Magistrate hearing held the **04/06/2016** and based upon the evidence, the Code Enforcement Special Magistrate enters the following findings of fact, conclusions of law and orders:

JAMES LITTLEJOHN & ROBERT CLAR, LEROY WILLIAMS is (are) found guilty of violating Ordinance 12-19 City Codes, to wit:

     12-19        (NUS) NUISANCE HEALTH & SAFETY

     NO PERSON OWNING, LEASING, RENTING OR OCCUPYING LAND IN THE
     CITY SHALL PERMIT OR MAINTAIN ANY NUISANCE WHICH TENDS TO
     ANNOY THE COMMUNITY OR INJURE THE HEALTH OF THE CITIZENS.

upon the following real property: **1977 NE 119 RD**

     28 33 52 42SANS SOUCI ESTS     PB 50-86LOT 103     BLK 14LOT SIZE    75.000 X 125OR
     20516-4414 05 2002 1COC 26198-1620 11 2005 5

**It Is Therefore Ordered That** the above-described violation shall be abated by no later than 12:00 noon on
     Tuesday, May 3, 2016

**It Is Further Ordered That** the defendant(s) pay a fine up to $250.00 per day if the violation continues beyond the time and date set for complicance in this Order. The specific fine shall be set by the Code Enforcement Special Magistrate at a hearing to be set at a future date. Said defendant(s) shall be required to appear at said hearing if they desire an opportunity to be heard on the amount of said fine or the quesiton of compliance.

**It Is Further Ordered That** upon notification by the Code Enforcement Officer and upon findings by the Code Enforcement Special Magistrate that the same violation has been repeated by the same violator, the Special Magistrate may order the violator to pay a fine not to exceed $500.00 per day for each time the violation has been repeated, beginning with the date the repeat violation is found to have occurred by the Code Enforcement Officer, and a hearing shall not be necessary for issuance of the order so providing.

**It Is Further Ordered That** since the City has prevailed in prosecuting this case before the Code Enforcement Special Magistrate, the City is entitled to recover costs of prosecution due within ten (10) days of the date of this Order to comply.

**It Is Further Ordered That** in certain cases, the City may make repairs which are required to bring the property into compliance and be entitled to recover from defendant(s) all costs of the repairs along with the fine.

**Failure To Comply** by the time and date specified in this Order or to thereafter maintain compliance may result in a lien against the property on which the violation exists, and upon any other real or personal property on which the violation exists, and upon any other real or personal property owned by the defendant(s) named above pursuant to Chapter 162, Florida Statues. The City of North Miami shall be entitled to collect all costs incurred in recording and satisfying such lien, pursuant to Chapter 162, Florida Statutes.

Upon compliance, it is the responsibility of the defendants(s) to notify the Code Enforcement Officer of the city in order to obtain a compliance inspection to stop the fine from running.

DONE AND ORDERED THIS

_____
Clerk

_____
Code Enforcement Special Magistrate

**ACKNOWLEDGEMENT**

On this April 06, 2016 the Code Enforcement Special Magistrate and Crystal Castro, Clerk of the Code Enforcment Special Magistrate, personally appeared before me and acknowledged the execution of this Order.

_____
**Notary Public**

PILAR DIAZ
MY COMMISSION # FF 244880
EXPIRES: October 28, 2019
Bonded Thru Budget Notary Services

Copies Furnished to:
Defendant
Staff

\\sqlserver\EDEN\reports\Site Custom Reports\pm\OTC.rpt



*Exb. "F"*

**CERTIFIED MAIL NO: 7013 3020 0001 6551 4433**

April 14, 2016

Mr. Maurice Symonette
1977 NE 119 Road
North Miami, FL 33161

Dear Mr. Symonette:

On April 5, 2016, your boat was reported as sunk behind the above location. This is a violation of the below listed State Law. This sunken boat has been deemed a navigational hazard and must be salvaged immediately.

Please make all necessary arrangements with a salvage company and comply with this State Law within 10 days of receipt of this letter. Failure to do so may constitute a lien against the vessel and the property for the costs incurred by the City. Your anticipated cooperation with this matter may preclude you from possible criminal charges.

**823.11   Derelict vessels; relocation or removal; penalty.—**

(2)   It is unlawful for a person, firm, or corporation to store, leave, or abandon any derelict vessel in this state.

(3)   The commission, officers of the commission, and any law enforcement agency or officer specified in s. 327.70 are authorized and empowered to relocate, remove, or cause to be relocated or removed a derelict vessel from public waters if the derelict vessel obstructs or threatens to obstruct navigation or in any way constitutes a danger to the environment, property, or persons. The commission, officers of the commission, or any other law enforcement agency or officer acting under this subsection to relocate, remove, or cause to be relocated or removed a derelict vessel from public waters shall be held harmless for all damages to the derelict vessel resulting from such relocation or removal unless the damage results from gross negligence or willful misconduct.

(5)   A person, firm, or corporation violating this section commits a misdemeanor of the first degree and shall be punished as provided by law. A conviction under this section does not bar the assessment and collection of the civil penalty provided in s. 376.16 for violation of s. 376.15. The court having jurisdiction over the criminal offense, notwithstanding any jurisdictional limitations on the amount in controversy, may order the imposition of such civil penalty in addition to any sentence imposed for the first criminal offense.

Sincerely,

Larry M. Spring, Jr., CPA
City Manager

C       Chief Leonard Burgess



United States Bankruptcy Court
Southern District of Florida

*Exhibit # G*
*pages 1 — 7*

## Notice of Bankruptcy Case Filing



FILED
03/21/2016
3:59 PM

A bankruptcy case concerning the debtor(s) listed below was filed under Chapter 13 of the United States Bankruptcy Code, entered on 03/21/2016 at 4:02 PM and filed on 03/21/2016.

**Kurt Marin**
10290 SW 58 ST
Miami, FL 33173
SSN / ITIN: xxx-xx-7450

The bankruptcy trustee is:

**Nancy K. Neidich**
www.ch13miami.com
POB 279806
Miramar, FL 33027
954-443-4402

The case was assigned case number 16-13958-AJC to Judge A. Jay Cristol.

In most instances, the filing of the bankruptcy case automatically stays certain collection and other actions against the debtor and the debtor's property. Under certain circumstances, the stay may be limited to 30 days or not exist at all, although the debtor can request the court to extend or impose a stay. If you attempt to collect a debt or take other action in violation of the Bankruptcy Code, you may be penalized. Consult a lawyer to determine your rights in this case.

If you would like to view the bankruptcy petition and other documents filed by the debtor, they are available at our *Internet* home page www.flsb.uscourts.gov or at the Clerk's Office, , .

You may be a creditor of the debtor. If so, you will receive an additional notice from the court setting forth important deadlines.

**Joseph Falzone**
**Clerk, U.S. Bankruptcy Court**

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/12/2018 14:39:51 | | |
| **PACER Login:** | mv3320:4202789:0 | **Client Code:** | |

Case 16-13958 UNITED STATES BANKRUPTCY COURT Page 1 of 14  *Amended*

**SOUTHERN DISTRICT OF FLORIDA**

www.flsb.uscourts.gov

In re:

*Kurt Marin*

                    Debtor            /

Case No. *16-13958*

Chapter *13*

## DEBTOR'S NOTICE OF COMPLIANCE WITH REQUIREMENTS FOR AMENDING CREDITOR INFORMATION

This notice is being filed in accordance with Local Rules 1007-2(B), 1009-1(D), or 1019-1(B) upon the filing of an amendment to the debtor's lists, schedules or statements, pursuant to Bankruptcy Rules 1007, 1009, 1019 or 5010-1(B).  I certify that:

[ ]   The paper filed **adds** creditor(s) as reflected on the **attached list** (include name and address of each creditor being added).  I have:
1.   remitted the required fee (unless the paper is a Bankruptcy Rule 1019(5) report);
2.   provided the court with a supplemental matrix **of only the added creditors** on a CD or memory stick in electronic text format (ASCII or MS-DOS text), or electronically uploaded  the added creditors in CM/ECF;
3.   provided notice to affected parties, including service of a copy of this notice and a copy of  the §341 or post conversion meeting notice [see Local Rule 1009-1(D)(2)] and filed a certificate of service in compliance with the court [see Local Rule 2002-1(F)];
4.   filed an amended schedule(s) and summary of schedules; and
5.   filed a motion to reopen accompanied by the required filing fee (if adding creditors pursuant to Local Rule 5010-1(B)).

[ ]   The paper filed **deletes** a creditor(s) as reflected on the **attached list** (include name and address of each creditor being deleted).  **I have:**
1.   remitted the required fee;
2.   provided notice to affected parties and filed a certificate of service in compliance with the court [see Local Rule 2002-1(F)]; and
3.   filed an amended schedule(s) and summary of schedules.

[ ]   The paper filed **corrects** the name and/or address of a creditor(s) as reflected on the **attached list. I have:**
1.   provided notice to affected parties, including service of a copy of this notice and a copy of the §341 or post conversion meeting notice [see Local Rule 1009-1(D)(2)] and filed a certificate of service in compliance with the court [see Local Rule 2002-1(F)]; and
2.   filed an amended schedule(s) or other paper.

[ ]   The paper filed **corrects** schedule D or E/F amount(s) or classification(s).  **I have:**
1.   remitted the required fee;
2.   provided notice to affected parties and filed a certificate of service in compliance with the court [see Local Rule 2002-1(F)]; and
3.   filed an amended schedule(s) and summary of schedules.

[X]   None of the above apply. The paper filed does not require an additional fee, a supplemental matrix, or notice to affected parties. It ☑ does ☐ does not require the filing of an amended schedule and summary of schedules.

I also certify that, if filing amended schedules, Bankruptcy Form 106 "Declaration About an Individual Debtor's Schedules" (signed by both debtors) or Bankruptcy Form 202 , "Declaration Under Penalty of Perjury for Non-Individual Debtors" has been filed as required by Local Rules 1007-2(B), 1009-1(A)(2) and (D)(1), or 1019-1(B).

Dated: _5/6/16_

_____
Attorney for Debtor (or Debtor, if pro se)

_____
Print Name

_____
Florida Bar Number

Joint Debtor (if applicable)

Address _____

Phone Number _____

_5/6/16_

LF-4 (rev. 12/01/15)

*Amended*

p20*160506pm1059USBCSDF-MIA

| | | |
|---|---|---|
| Debtor 1 | *Kurt* | *MARIN* |
| | First Name    Middle Name | Last Name |
| Debtor 2 | | |
| (Spouse, if filing) | First Name    Middle Name | Last Name |

United States Bankruptcy Court for the: _____ District of _____

Case number  *16-13958    Chap 13*
(If known)

☑ Check if this is an
amended filing

## Official Form 106Sum

## Summary of Your Assets and Liabilities and Certain Statistical Information    12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Fill out all of your schedules first; then complete the information on this form. If you are filing amended schedules after you file your original forms, you must fill out a new *Summary* and check the box at the top of this page.

### Part 1:    Summarize Your Assets

**Your assets**
**Value of what you own**

1. *Schedule A/B: Property* (Official Form 106A/B)
   1a. Copy line 55, Total real estate, from *Schedule A/B* ........................................................    $ *1,966,119.00*

   1b. Copy line 62, Total personal property, from *Schedule A/B* ...............................................    $ *1,020,900.00*

   1c. Copy line 63, Total of all property on *Schedule A/B* .......................................................    $ *2,987,019.00*

### Part 2:    Summarize Your Liabilities

**Your liabilities**
**Amount you owe**

2. *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 106D)
   2a. Copy the total you listed in Column A, *Amount of claim*, at the bottom of the last page of Part 1 of *Schedule D* ............    $ *1,805,272.00*

3. *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 106E/F)
   3a. Copy the total claims from Part 1 (priority unsecured claims) from line 6e of *Schedule E/F* ...........................................    $ _____

   3b. Copy the total claims from Part 2 (nonpriority unsecured claims) from line 6j of *Schedule E/F* .....................................    + $ _____

**Your total liabilities**    $ *1,805,272.00*

### Part 3:    Summarize Your Income and Expenses

4. *Schedule I: Your Income* (Official Form 106I)
   Copy your combined monthly income from line 12 of *Schedule I* ..................................................    $ *12,000.00*

5. *Schedule J: Your Expenses* (Official Form 106J)
   Copy your monthly expenses from line 22c of *Schedule J* ..........................................................    $ *11,470.00*

*Amended*

(4)

Debtor 1 ___*Kurt*_____ ___*MARIN*_____
First Name   Middle Name   Last Name

Case number *(if known)* __*16-13958*__

---

**Part 4:   Answer These Questions for Administrative and Statistical Records**

6. Are you filing for bankruptcy under Chapters 7, 11, or 13?

☐ No. You have nothing to report on this part of the form. Check this box and submit this form to the court with your other schedules.

☑ Yes

---

7. What kind of debt do you have?

☐ Your debts are primarily consumer debts. *Consumer debts* are those "incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). Fill out lines 8-9g for statistical purposes. 28 U.S.C. § 159.

☐ Your debts are not primarily consumer debts. You have nothing to report on this part of the form. Check this box and submit this form to the court with your other schedules.

---

8. From the *Statement of Your Current Monthly Income*: Copy your total current monthly income from Official Form 122A-1 Line 11; OR, Form 122B Line 11; OR, Form 122C-1 Line 14.

$ *12,000.00*

---

9. Copy the following special categories of claims from Part 4, line 6 of *Schedule E/F*:

**Total claim**

From Part 4 on *Schedule E/F*, copy the following:

9a. Domestic support obligations (Copy line 6a.)      $ *0*

9b. Taxes and certain other debts you owe the government. (Copy line 6b.)      $ *0*

9c. Claims for death or personal injury while you were intoxicated. (Copy line 6c.)      $ *0*

9d. Student loans. (Copy line 6f.)      $ *0*

9e. Obligations arising out of a separation agreement or divorce that you did not report as priority claims. (Copy line 6g.)      $ *0*

9f. Debts to pension or profit-sharing plans, and other similar debts. (Copy line 6h.)      + $ *0*

9g. Total. Add lines 9a through 9f.      $ *0*

---

Official Form 106Sum   **Summary of Your Assets and Liabilities and Certain Statistical Information**



page 2 of 2

⑤

 LP'1605068M1059USBCSDF·MIA

Fill in this information to identify your case and this filing

| Debtor 1 | Kurt | | MARIN |
|---|---|---|---|
| | First Name | Middle Name | Last Name |

Debtor 2
(Spouse, if filing) First Name          Middle Name          Last Name

United States Bankruptcy Court for the: Southern District of Florida

Case number 16-13958

☒ Check if this is an
amended filing

## Official Form 106A/B

# Schedule A/B: Property                                    12/15

In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

### Part 1:    Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest in

1. Do you own or have any legal or equitable interest in any residence, building, land, or similar property?

☐ No. Go to Part 2.
☐ Yes. Where is the property?

1.1. _____
Street address, if available, or other description

3320 NE 165 St

Miami          FL.     33160
City            State    ZIP Code

Miami Dade
County

**What is the property?** Check all that apply.
☑ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

**Who has an interest in the property?** Check one.
☐ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Other information you wish to add about this item, such as local property identification number: _____

Do not deduct secured claims or exemptions. Put the amount of any secured claims on Schedule D: Creditors Who Have Claims Secured by Property.

Current value of the entire property?    Current value of the portion you own?
$ 989,553.00          $ 989,553.00

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

owner of Mortgage

☐ Check if this is community property
(see instructions)

If you own or have more than one, list here:

1.2. _____
Street address, if available, or other description

10290 SW 58th St

Miami          FL. 33173
City            State    ZIP Code

Miami Dade
County

**What is the property?** Check all that apply.
☐ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

**Who has an interest in the property?** Check one.
☐ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Other information you wish to add about this item, such as local property identification number: _____

Do not deduct secured claims or exemptions. Put the amount of any secured claims on Schedule D: Creditors Who Have Claims Secured by Property.

Current value of the entire property?    Current value of the portion you own?
$ _____          $ _____

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

☐ Check if this is community property
(see instructions)

Debtor 1    *Kurt    Marin*    Case number *(if known)* 16-13958

First Name    Middle Name    Last Name

**1.3.** _____

Street address, if available, or other description

_____

_____

City    State    ZIP Code

_____

County

**What is the property?** Check all that apply.

☐ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

**Who has an interest in the property?** Check one.

☐ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

Other information you wish to add about this item, such as local property identification number: _____

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

Current value of the entire property?    Current value of the portion you own?

$_____    $_____

Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.

_____

☐ Check if this is community property (see instructions)

2. Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here. .................................................... →    $_____

---

## Part 2: Describe Your Vehicles

Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not? Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

3. Cars, vans, trucks, tractors, sport utility vehicles, motorcycles

☐ No
☑ Yes

**3.1.** Make: *Mercedes Benz*

Model: _____

Year: *1989*

Approximate mileage: _____

Other information:
_____

**Who has an interest in the property?** Check one.

☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

☐ Check if this is community property (see instructions)

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

Current value of the entire property?    Current value of the portion you own?

$ *1900.00*    $ *1900.00*

If you own or have more than one, describe here:

**3.2.** Make: _____

Model: *N/A*

Year: _____

Approximate mileage: _____

Other information:
_____

**Who has an interest in the property?** Check one.

☐ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

☐ Check if this is community property (see instructions)

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

Current value of the entire property?    Current value of the portion you own?

$_____    $_____

Official Form 106A/B    Schedule A/B: Property    page 2

Debtor 1 _Kurt_ _Marin_     Case number (if known) _16-13958_
   First Name    Middle Name    Last Name

---

**3.3.** Make: N/A
Model:
Year:
Approximate mileage:
Other information:

**Who has an interest in the property?** Check one.
❑ Debtor 1 only
❑ Debtor 2 only
❑ Debtor 1 and Debtor 2 only
❑ At least one of the debtors and another

❑ Check if this is community property (see instructions)

Do not deduct secured claims or exemptions. Put the amount of any secured claims on Schedule D: Creditors Who Have Claims Secured by Property.

Current value of the entire property?       Current value of the portion you own?
$ _____       $ _____

**3.4.** Make: N/A
Model:
Year:
Approximate mileage:
Other information:

**Who has an interest in the property?** Check one.
❑ Debtor 1 only
❑ Debtor 2 only
❑ Debtor 1 and Debtor 2 only
❑ At least one of the debtors and another

❑ Check if this is community property (see instructions)

Do not deduct secured claims or exemptions. Put the amount of any secured claims on Schedule D: Creditors Who Have Claims Secured by Property.

Current value of the entire property?       Current value of the portion you own?
$ _____       $ _____

---

**4. Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories**

*Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

❑ No
☑ Yes

**4.1.** Make: _Victory_
Model: _656976_
Year: _1977_
Other information:
_54 Ft Yacht_
_12 Ft. wide_

**Who has an interest in the property?** Check one.
☑ Debtor 1 only
❑ Debtor 2 only
❑ Debtor 1 and Debtor 2 only
❑ At least one of the debtors and another

❑ Check if this is community property (see instructions)

Do not deduct secured claims or exemptions. Put the amount of any secured claims on Schedule D: Creditors Who Have Claims Secured by Property.

Current value of the entire property?       Current value of the portion you own?
$ _4,000,000.00_       $ _4,000,000.00_

If you own or have more than one, list here:

**4.2.** Make:
Model:
Year:
Other information:
N/A

**Who has an interest in the property?** Check one.
❑ Debtor 1 only
❑ Debtor 2 only
❑ Debtor 1 and Debtor 2 only
❑ At least one of the debtors and another

❑ Check if this is community property (see instructions)

Do not deduct secured claims or exemptions. Put the amount of any secured claims on Schedule D: Creditors Who Have Claims Secured by Property.

Current value of the entire property?       Current value of the portion you own?
$ _____       $ _____

---

**5.** Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for pages you have attached for Part 2. Write that number here ..................................... ➔  $ _____

---

